STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Vermont Unit | Docket No. 74-6-13 Vtec |

| | |
|---|---|
| In re Connor Group, LLP Major Site Plan and Conditional Use Application | DECISION ON THE MERITS |

This appeal concerns a new development proposed for the property located at 13 Maiden Lane in the City of Saint Albans, Vermont ("City"). The subject property currently hosts the Smith House, built by John Smith in the 1820s. The main building of the Smith House is of undisputed historical significance, both because of its uses for most of the past two centuries and because of Mr. Smith, who brought the railroad system to this region of North America, served in both the Vermont State and United States House of Representatives, and was father and grandfather to two Vermont governors. The parties here do not dispute that Mr. Smith and the property he originally developed are historically significant to the City, the region, and the nation, as acknowledged by the property's long-standing placement on the National Register of Historic Places.

The recent history of the Smith House, however, is sad and depressing. The property has been redeveloped and the subject of several additions. Most recently, it thrived as the home of a vibrant private club known as the Owl's Club, but during the last three or more decades, the Owl's Club membership dwindled to such an extent that efforts to even minimally maintain the property failed; it has remained unoccupied and deemed unsafe to occupy for the last ten or more years.

The Connor Group, LLP ("Applicant") purchased the Smith House property in 2012. After its purchase, Applicant investigated its rehabilitation, but ultimately proposed to demolish all buildings on the property and build a new commercial structure for clinic, medical, or office uses. The City of St. Albans Development Review Board ("DRB") approved Applicant's demolition request and application for site plan and conditional use approvals for its proposed new building. Neighbors Peter D. Ford, Susan Prent, and Mark Prent ("Appellants") timely

appealed that decision to this Court and sought a court order to prohibit the demolition of the Smith House and all additions. Appellants also oppose Applicant's request for site plan and conditional use approvals.

## Procedural Background

Appellants initially represented themselves in filing an appeal of the May 28, 2013 DRB decision that approved Applicant's request to demolish the Smith House and all its additions, as well as site plan and conditional use approval for a clinic, medical, or office facility. Several months later, on August 20, 2013, Attorney Paul S. Gillies, Esq. entered his appearance on behalf of Appellants and filed a motion requesting a stay of the demolition of the Smith House. The Court scheduled a site visit and hearing on that motion for September 23, 2013. Attorney William A. Fead, Esq. has represented Applicant throughout these proceedings.

On September 24, 2013 at the conclusion of the continued hearing on the stay motion, the Court, relying upon a stipulation of the parties, entered a temporary stay to remain in effect until November 30, 2013.[1] That stay only prohibited Applicants from demolishing the Smith House itself, because Appellants advised that they were not advocating for the preservation of any of the Smith House additions.

Appellants thereafter filed a motion for a continued stay, which was the subject of evidentiary hearings on November 14 and 18, 2013. At the conclusion of the taking of evidence, the Court deliberated and conducted research on the pending motion, after which it reopened the hearing and announced its decision to deny the motion for a continued stay and to vacate the temporary stay. The Court thereafter issued its November 20, 2013 Entry Order memorializing its decision on the stay requests and directing the parties to prepare for trial.

The Court completed the trial on Applicant's pending application on May 7, 2014 and thereafter allowed the parties time to file post-trial memoranda and replies thereto. The matter thereafter came under advisement before the Court on May 29, 2014. The Court apologizes to the parties for its delay in drafting this Merits Decision, which has been caused in

---

[1] The Court initially set October 24, 2013 as the expiration date for its temporary stay. However, pursuant to a stipulation by the parties, the Court thereafter extended the temporary stay until November 30, 2015. See Entry Order of October 25, 2013.

part by administrative matters and unanticipated needs.  We do not offer these as explanations or excuses; we regret the Court's delay and repeat our apologies to the parties.

Based upon the testimony, exhibits, and other evidence presented and admitted at trial, including that which was put into context by the site visit that the Court conducted with the parties, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

## Findings of Fact

### I.    The Smith House and Its Additions

1.    Applicant Connor Group, LLC proposes to re-develop property at 13 Maiden Lane in the downtown area of the City of St. Albans, Vermont.  We hereinafter refer to this as the "Subject Property" and reference trial Exhibit 9 to show the current improvements on that Property; a copy of which is attached to this decision for the reader's reference.  We note that the Exhibit 9 sketch plan is not drawn or reproduced to scale.  A more detailed and to-scale plan of the existing conditions at the Subject Property is entitled "Existing Conditions Plan," a copy of which was admitted at trial as Exhibit 17.

2.    Maiden Lane runs the length of one city block and is located east of and parallel to U. S. Route 7, which also serves as the City's Main Street.  Traffic on Maiden Lane is one-way, running from south to north, and connects Congress Street to Bank Street, both of which run east and west.[2]

3.    The Subject Property consists of 0.65± acres and is in the shape of a large boot, squared-off at the top and laying in its side, such that the top of the boot is along Maiden Lane.  See Exhibits 9 and 17.  The Subject property is located at the southwest corner of the intersection of Maiden Lane and Congress Street.  The front of the subject Property is set back about twenty-seven feet from Maiden Lane.  The back of the boot is parallel to Congress Street and faces north; the sole runs along the rear boundary of the Property, shared with an adjoining property

---

[2] The Maiden Lane one-way traffic used to (and may still) flow from north to south, but the St. Albans City Council determined that changing the direction of the one-way traffic on Maiden Lane would be safer for pedestrians crossing the Congress Street/Maiden Lane intersection and would better accommodate the angled parking proposed in front of the Library and the Subject Property.  That Council determination has become final and is not subject of review in this appeal.

to the east; and the toe abuts an adjacent property, facing south, and is occupied by a large gravel parking area.  The toe of the boot-shaped Property is adjacent to the property that hosts the St. Albans Free Library.  See Exhibit 10.  The Subject Property has frontage on both Maiden Lane and Congress Street.

4.      As displayed on the Exhibit 9 sketch plan, the Subject Property has been improved with a "Brick House," which is also referred to as the Smith House, circa 1820.

5.      The Smith House was built in the Federal style with a red brick exterior.  Most of the exterior brick walls are the width of three bricks.  The Smith House is of a boxed design, with an exterior measuring 32-feet by 36-feet.  The original foundation, consisting of both mortared and dry-stacked stone, may still be viewed from both interior and exterior locations.  The exterior cornices are boxed with returns.

6.      The front exterior  elevation of the Smith House is gabled with a fanlight at the roof peak that once had wooden sashes to provide for ventilation.  A ten-foot wide, single-story Queen Anne style porch wraps around the House's front and south side first floor elevations.  Details around the porch and the lattice below it once added to the character and charm of the porch and House.

7.      At best estimate, the first additions to the Smith House were constructed in the 1870s.  Evidence received at trial suggests that the "East House Addition," which either substantially or wholly replaced the first addition, was constructed in the early 1900s after the Property had ceased being used as a home and was being used as a private club, known as the "Owl's Club."[3]  See 1901 City tax map, admitted at trial as Exhibit 10.

8.      The East House Addition, as it currently stands, is a two story structure attached to the eastern side of the Smith House, measuring 37 feet by 43 feet, with a peak running west to east parallel to Congress Street.  Construction of the East House Addition required that the eastern portion of the Smith House roof be dismantled to allow for the East House Addition roof line to be tied in.  This effort removed the independent integrity of the original Smith House roof.

---

[3]  Best estimates are that the Owl's Club was established and began using the Smith House as its meeting place sometime in the 1880s.  See Exhibit 21 at p. 11.

9.      The next addition was formerly identified as the Billiards Room and is now identified and labeled on Exhibit 9 as the Main Hall.  The Main Hall is attached directly to the southern side of the East House Addition.  The Main Hall measures 56 feet by 30 feet, includes two stories, and once provided large, open space function rooms on the first and second floors.  Best estimates at trial were that the Main Hall was constructed sometime in the early 1900s.

10.     The next two additions were made in the early 1970s to accommodate planned expansions of the Owl's Club.  These additions ultimately proved unsuccessful and perhaps expedited the Owl's Club's downfall and closure.  The first of these two additions is labeled the "Shed Roofed Addition"; the second is identified as the "Racquetball Addition."  See Exhibit 9.

11.     Sometime in the late 1980s or early 1990s, there was a plan to construct bowling alleys in the basements below the Smith House and the Main House Addition.  This plan gave rise to the partial removal of several structural columns in those basements, digging and dredging, and the introduction of a significant amount of poured concrete.  The work was not completed before the financial failure and closure of the Owl's Club.  Some structural columns in those basements were left unrepaired.  Water now regularly flows into those basements, leading to further structural deficiencies.

12.     The Smith House itself, consisting of two stories, provided about 3,424 square feet of usable interior space.  When all additions had been constructed and were usable, the combined areas provided 12,422 square feet of usable interior space.

13.     During the September 23–24, 2013 hearings on Appellants' motion to stay demolition, Appellants refined their objections to the planned demolition.  Although they continued to assert that the Smith House was of enough significance and had sufficient structural integrity that it should be saved from demolition, they no longer objected to the demolition of the various additions to the Smith House.

**II.     Deterioration of the Smith House and Its Additions**

14.     The condition of all the buildings on the Subject Property is deplorable.  The present condition reveals that a complete absence of maintenance, abject neglect, wood rot, deterioration of the roofs and support structures, infestation of rainwater, ground water, and

mold, have existed since long before Applicant gained ownership and control of the premises in 2012.

15.    Applicant's experts and employees provided the most credible testimony, photographs, and other evidence concerning the current condition of the Smith House and its additions. Applicant's employees are well versed and experienced in the restoration and rehabilitation of historical structures, including those that have suffered neglect, misuse, and abandonment. They have successfully repaired and rehabilitated a number of historical structures that were in serious disrepair, albeit not as severe as the Smith House.

16.    The intrusion of rain water and ground water, with the resulting mold infestation, has been particularly debilitating for the Smith House and its additions. Several interior walls and ceilings, often laden with water, have collapsed. The water intrusions have been so complete as to cause structural beams and trusses to rot, become compromised, and in some instances, collapse. Many areas of the buildings are unsafe to walk upon; those that may be safe do not appear so due to the collapse of nearby walls and ceilings.

17.    The mold inside the Smith House is especially pervasive, as shown in some of the photos attached to the report from Applicants' engineer, Ruggiano Engineering, Inc. See trial Exhibit 3 at 11–19 for select photos. One of the most debilitating aspects of the long-existing water and mold damage is that it permeates into the structural timbers of the walls and ceilings throughout the Smith House and its additions.

18.    The credible descriptions at trial revealed that even a complete interior and structural reconstruction is unlikely to remove the mold infestation within external walls and the basement. No expert could assure the Court that even an extensive rehabilitation of the Smith House would make it habitable.

19.    Although construction of the Smith House incorporated a somewhat intricate wood structural system to support its roof, the rain, neglect, and rot have contributed significantly to roof damage. The eastern portion of the Smith House roof would need to be completely replaced, it cannot be rehabilitated. Additionally, many of the easterly roof trusses were cut and removed when the East House Addition was attached. While this work allowed the Smith House and the East House Addition roofs to become integrated, it also caused the Smith House

-6-

roof to lose its independent integrity. It will likely be impossible to stabilize the eastern portion of the Smith House roof prior to removal of the East House Addition.

20.     The credible evidence convinces the Court that the Smith House could not be preserved after removal of the East House and other Additions because demolition of the East House Addition will likely cause the eastern exterior wall and roof of the Smith House to collapse. Several experts speculated about various temporary support structures that could be put in place to preserve the Smith House, but such a structure would either be impossible to construct without exorbitant costs or would require the removal of significant portions of the Smith House.

21.     The red brick exterior of the Smith House is also extensively damaged by water and neglect. In many areas, and especially along the north wall, the exterior wythe[4] of brick is so loose and damaged that bricks may be easily removed by hand. The exterior wythe has become detached from the interior wythes, appears to bow out, and looks to be on the verge of collapse in some areas. The brick exterior will need to be replaced is most areas; it cannot be repaired or salvaged.

22.     The Smith House foundation in many areas was constructed of red bricks, many of which are flaking or "spalling," due the tremendous exposure to moisture. Many of these bricks are so deteriorated as to require replacement.

23.     Lead-based paints were used on many exterior and interior walls. All painted areas will need to be examined, removed or remediated at great expense.

24.     The basement and its exterior walls evidenced further extensive damage and decay. A stream of groundwater now flows along the dirt floor; it has been allowed to flow for so long that it has compromised the stone and concrete footings in several places. The east wall of the basement has been extensively compromised by the excavation that occurred in connection with the East House Addition and the failed attempt to construct a bowling alley in the basement. Repairs have been attempted to some areas, but were not successful. Stones are loose or falling out and the mortar is crumbling. The western foundation wall is extensively deflected; that is, it has become bowed out and no longer respects a straight or true line.

---

[4] The exterior brick walls are made up of three layers of brick; each brick layer is referred to as a "wythe."

25.    In many areas where there are wooden sills atop the stone foundation, the sills are rotted by moisture; the moisture has so compromised the wood that in some places, the wood is compressed by the building load.

26.    In 2010, before Applicants acquired the Subject Property, the City of St. Albans Fire Marshal and Building Safety Officer ("Fire Marshal") gave notice to the then owners that the structural neglect of the Smith House and its Additions was compromising its safety and habitability.  No evidence was presented at trial that any remedial measures were taken in response to this 2010 notice.

27.    On March 13, 2013, the Fire Marshal issued a Safety Order (Exhibit 2), noting that the building was at risk of collapse; that as a result of water damage and neglect, numerous structural systems had been compromised; that the condition of the roofs and flashing have allowed for severe water damage to occur; that the water intrusion had infiltrated and compromised the electrical system, which may now cause a fire; and that the automatic sprinkler systems were in disrepair and likely would not function in the event of a fire.  Based upon these conditions, the Fire Marshal concluded that the Smith House was "dangerous and unsafe . . . [and a]batement, by demolition of this structure, or submission of an alternate re-development plan that mitigates the risk to public safety is necessary . . . ." Id.

28.    Applicant, through its principals, has conducted an extensive and reasonable investigation of alternate re-development plans for the Smith House.  They have also solicited ideas from City officials, interested parties, and the general public.  There was no credible evidence presented that a feasible alternate re-development plan has or can be made for the Smith House, given its current condition.

29.    The only feasible plans for the Smith House and its Additions (collectively or as separate buildings) are to demolish the structures and safely dispose of the debris.

30.    Complete demolition of the Smith House and its Additions is likely to take about two weeks of full-time effort and would likely cost between $50,000.00 and $75,000.00.

### III. Attempts to Preserve the Smith House

31. Applicant's experts credibly estimated that rehabilitation or replacement of the Smith House alone would cost up to five times the cost of the proposed new structure. The new structure would include about 11,500 square feet of usable space; the rehabilitated Smith House would provide about 3,400 square feet of usable space.

32. The cost estimates provided by Appellants' expert were not credible. In addition, they did not include the costs for new heating/ventilation/AC systems, components necessary to satisfy current fire and safety regulations, and an elevator system, made necessary by current regulations and the multi-story structure that is the Smith House.

33. Applicant's cost estimator credibly testified that the necessary rehabilitation for the Smith House is not feasible, due to the extensive work and cost, which he credibly estimated to be in excess of $2,316,253.00, which would equate to just over $681.00 per square foot of usable space. See Exhibit 14 for estimate details. Conversely, this witness credibly estimated that the cost for all demolition work, site cleanup, and construction of the shell[5] for the new two-story building would equate to about $60.00 per square foot of usable space in the new building.

34. In light of the conclusion that the current condition of the Smith House and its Additions necessitates demolition, Applicant retained historian Susan C. Jamele, who completed a thorough evaluation of the history, characteristics, and significance of the Smith House and its Additions. A copy of Ms. Jamele's report was admitted at trial as Exhibit 21. At trial, Ms. Jamele provided further explanation by way of testimony, and affidavit, and supplemental report. See Exhibit 22.

35. In her report, Ms. Jamele credibly and completely documents the significance of the Smith House structures, gardens, landscaping, and outbuildings that either now or once existed.

---

[5] By shell, we understood that the witness's estimate was based upon a proposal to complete demolition and site work, and to construct the proposed new building, with all systems and finished exterior, but not including interior walls or finishes that a commercial tenant would require. We found this estimate to be a credible and helpful comparison to the hypothetical renovation of the Smith House, since no witness included estimates for the additional construction work necessary to prepare the rehabilitated Smith House as a turn-key space for an unidentified future tenant.

Her report makes note of significant architectural features and items of historical importance, including the significant contributions of Mr. Smith to this City, the region, and the nation.

36.     Her supplemental report, as reviewed and explained by her trial testimony, provided further details concerning the architectural features of the Smith House, in particular its chimneys, plaster and split-lath walls, windows, doors, and molding.  Taken together, the Jamele report and supplements provide an exacting detail of the historical characteristics of the Smith House, its grounds, and additions.

37.     The Smith House was nominated to be listed on the National Register of Historic Places when the Owl's Club was still in operation.  A copy of the nomination was admitted at trial as Exhibit 12.

38.     Applicant and its officers have made multiple attempts to seek out public and governmental interest for preservation of either the Smith House or some components thereof. They have publicized their willingness to assist in salvage efforts at the Subject Property, including providing public notices at the hearings on their permit applications before the DRB and the City of St. Albans Design Advisory Board ("DAB"), and during interviews with area news outlets.  During the sixteen months between the filing of their permit application and the trial before this Court, the Connor Group officials did not receive a single substantive suggestion or inquiry about preservation options.

39.     Applicant's officers also contacted officials at the nearby St. Albans Historical Museum, but Museum officials did not express any interest in assisting in the preservation of the Smith House or any item remaining within it.

40.     Applicant, through its officers' efforts, investigated financial assistance, low-cost loan options, and other incentives to attract interested users and project developers for a possible Smith House rehabilitation.  They received no substantive responses or inquiries, which they credibly attributed to the deplorable condition of the Property.

41.     When these salvage efforts failed, Applicant donated fireplace surrounds, cast iron heat radiators, interior wooden doors, flooring, and other miscellaneous items to a local non-profit that focuses on reusing and providing educational training concerning salvageable materials.

Applicant also salvaged an arched window for its own use. No other party has contacted Applicant or its principals seeking any items from the Smith House.

42. Based upon Applicant's extensive efforts, the Court concludes that no items of value remain worthy of salvage from the Smith House.

**IV.** **Surrounding Neighborhood**

43. The Subject Property and its surrounding neighborhood are located in the B-1 Central Business Subdistrict ("B-1 District") of the Business Zoning District. The Subject Property is located less than one City block from Taylor Park, which is located along Main and Church Streets, at the center of the downtown Business District. The Subject Property and surrounding properties are also located within the National Landmark Historic District.

44. The Subject Property and its neighbors are located in the Design Review 1 – Traditional Downtown Overlay District.

45. Adjoining properties host the St. Albans Free Library, Episcopal and Baptist Churches, a dental office, single family residences, and a large apartment building. See Exhibit 17.

46. Most of the nearby churches, the Library, and residences occupy buildings that have historical significance and are recognized as contributing buildings on the National Register of Historic Places.

47. Many of the nearby residences are in buildings with brick exteriors. Most of the nearby office or commercial businesses are in buildings sided in wood clapboard or other materials.

48. The northern edge of the downtown business district is located one block north of the Subject Property, which hosts several office buildings and businesses, including a J.C. Penny's, an Ace Hardware Store, and similar businesses.

49. Neighborhood parking is allowed along the streets in the area of the Subject Property. While much of this on-street parking is parallel to the streets, other nearby areas allow for parking at about a forty-five degree angle to the street. Much of the parking along Main Street, one block from the subject property, is angled parking.

50. One block south of the Subject Property, just east of Taylor Park, lies Church Street, which hosts several Churches, the St. Albans Historical Museum, and the County Courthouse,

home to what is now known as the Civil Division, Franklin Unit, of the Vermont Superior Court. This appeal was tried in that Courthouse.

**V.      Proposed new building for clinic, medical, or office use**

51.      Applicant first presented its proposed redevelopment of the Subject Property during a presentation to the DRB.  Applicant then made revisions to its proposed building design and site plan in response to concerns raised during the DRB process.  The revised site plan is depicted on Exhibits 19 and 33.

52.      The proposed new commercial building is expected to host clinic, medical, or office uses, although specific tenants were not identified at trial.  The new building will be oriented with its front facing Maiden Lane, similar to the Smith House.  Since the Property slopes gently downward from the rear of the Property to Maiden Lane, the front entry will provide access to the offices located on the first floor and the rear entry will provide access to the offices located on the second floor.

53.      Once the site is cleared of all debris from the demolished building, it will be regraded and a new drainage system will be installed to divert groundwater away from the building site to approved drainage systems.  This new drainage system will allow for the development to be protected from the flow of groundwater that travelled through the Smith House basement.

54.      The front of the new building will be set back twenty-six feet from Maiden Lane, which is one foot less than the twenty-seven foot setback respected by the Smith House.  The proposed setback is nearly identical to those of the buildings on the same side of Maiden Lane, including the St. Albans Free Library and the Leahy property.  The Subject Property, the Library, and the Leahy property are the only buildings on the eastern side of Maiden Lane.

55.      Appellants asserted that Applicant's proposed new building will be out of character with the neighborhood because of its size and mass, but the uncontested evidence concerning the neighboring properties refuted their assertion.  The Library, apartment building across Maiden Lane from the Subject Property, and the building that houses the dentists' office, located across Congress Street, are similar to the proposed new building in regards to size and mass.  The other buildings in the area are as large as or larger than the proposed new building.

56.     Most of the parking for the new development (35 spaces) will be located in a parking lot to the rear of the Property, in addition to handicap parking spaces in the rear and front of the building.  The rear parking lot will extend into an area located behind the adjacent Library.  See Exhibit 33.

57.     Applicant's original rear parking plan called for a larger paved area behind the new building with 37 parking spaces.  Applicant revised that parking plan to reduce the parking area and allow for more green space.

58.     A wooden stockade fence in the rear of the Property, along a portion of the eastern boundary, once screened part of the Property's gravel parking area .  That fence is in poor condition and does not fully screen the gravel parking area.  Applicant proposes to construct and maintain a six-foot-high, colonial style PVC fence made to resemble wood, along the entire eastern boundary, so as to provide a sufficient screen from the rear parking area for adjoining neighbors.

59.     There will continue to be parking available in the front of the lot along Maiden Lane, although Applicants will modify a portion of the front of their lot so that the travelled portion of Maiden Lane may be widened from thirteen to twenty-one feet.  Additional parking for the new development along Maiden Lane will be realigned to allow vehicles to park at forty-five degree angles, which will increase the number of parking spaces available in front of the Subject Property from five to ten spaces.  Five of the new spaces will be designated for use by visitors to the Subject Property, while the other five will be designated for use by visitors to the adjoining Library.  The Library also plans to re-develop a portion of their front lawn to allow for five additional angled parking spaces to be constructed and used by Library visitors.

60.     Applicant also proposes to reconstruct the sidewalk along Maiden Lane, which will be located between the new angled parking spaces and the new building.  Both the City of St. Albans Fire Marshall and Public Works Director authored letters of support for Applicant's new parking and sidewalk plans.

61.     There is no new signage proposed on the property, other than directory signs at the entry ways.

62.     Details for the exterior of the proposed building are depicted on the Preliminary Drawings plan admitted at trial as Exhibit 19.  Applicant's engineer credibly testified that these plans depict the specific mass, siding, roof peaks, and transition lines for the building as now planned.  Appellants clarified at trial that they only object to the siding materials proposed by Applicant, not the color proposed.

63.     The front of the proposed building facing Maiden Lane will feature a prominent main entrance in the center of the building.  A pitched-roof canopy with support pillars to each side will help accentuate and articulate the main front entrance, which will consist of two large doors and framed glass side bars on either side, together with a glass-pained transom above the double doors.

64.     There will also be two smaller entry ways on the front of the building near the northern and southern edges of the front façade.  Each of these entry ways will have a sheltering canopy above the door way.

65.     The rear of the building, facing the main parking area, will also have a main entry way protected by a pitched roof canopy above a small porch.  This porch will also serve as the landing for a handicap access ramp.

66.     The front (west) and rear (east) of the building will exhibit two peaked roof areas on either end, with large transition moldings on the corners and middle sections of each façade. Transition molding will also separate the top of the second story from the peaked roof areas.  A louvered half oval gable will occupy each of the four roof peaks.

67.     Applicant's revised plan also includes extension of the eaves at the four main gables and stacked friese board detail at the perimeter of the entire building under the soffits. The exterior walls will be covered with fiber cement lap siding, manufactured and installed to resemble wooden clapboards.  The width of the exposed clapboards will become larger when the exterior transitions from the second floor area to the peaked roof area.  Large moldings will separate this transition from second story to peaked roof.

68.     Windows will be of a double-hung design, four over four, with twelve windows on the front, and similarly-spaced windows on the north, south, and east façades.  The parties hotly debated whether shutters on both sides of each window would help the building more closely

conform to the character of the area. The revised design of the building, without shutters, provides an appearance that complements the other commercial and residential buildings in the neighborhood.

69. Applicant provided detailed landscaping plans for its new development, which include removal of dead, dying, and overgrown bushes and trees and installation of new bushes and other plantings to complement the site. Appellants offered no objections at trial to Applicant's propped landscaping plans.

70. Appellants expressed concern about traffic generated by Applicant's proposed development, specifically about significant increases in traffic and congestion, and the resulting risks to travelers and pedestrians in the area. However, Appellants presented no specific facts or estimates as a foundation for their concerns.

71. Applicant's engineer provided credible estimates that convinced the Court that the proposed new building, even when fully occupied, is not likely to generate traffic in excess of that generated by the Owl's Club when it was operational, nor will it materially increase the existing neighborhood traffic. Applicant's engineer credibly, and without refutation from a competing expert or lay witness, relied upon generally accepted traffic estimators to prepare a Traffic Calculations Summary (Exhibit 26) that showed that the proposed uses would be unlikely to cause more than a 5% increase in peak hour trips generated, and is unlikely to generate more than the average trips generated, when compared to existing or past traffic in this neighborhood.

**Analysis**

By this appeal, Appellants presented a Statement of Questions containing 44 Questions, many of which have sub-parts, raising multiple legal issues. However, rather than asking the Court to address each of the legal issues raised, during and at the end of the trial Appellants advised that only five legal issues of concern remained. We therefore restrict our review to the five areas of concern identified by Appellants and itemized below as A through E.

**A. Demolition of the Smith House.**

Appellants challenge Applicant's proposed demolition of the Smith House. We note that our review of Applicant's demolition plans is limited by Appellants clarifications offered on the

second day of the hearing on their motion to stay Applicant's demolition activities. Appellants no longer object to the demolition of the Additions to the Smith House, only to the demolition of the Smith House itself. We therefore turn our analysis to the dispute concerning the proposed demolition of the Smith House.

First, we emphasize that all parties expressed despair about the demolition of the Smith House, and that by the end of the motion hearings, the Court joined in their despair. Although the historical significance of the Smith House and its original owner cannot be understated, the undisputed evidence demonstrates that the Smith House suffered through at least thirty years of extensive neglect, resulting in collapses and rainwater, groundwater, and mold infestation. It is not feasible for the Smith House or its components to be saved or further salvaged. The only present alternative, as devastating as it is to conclude, is to demolish the Smith House and allow for re-development of the site.

The Land Development Regulations for the City of Saint Albans (effective April 22, 2013) ("Regulations") provide specific directives and standards when demolition of an historic structure is proposed. First, the Regulations expressly state that the "demolition of historic structures is discouraged and shall be considered only as a last resort." Regulations § 706(A)(8)(e). The evidence presented at trial convinced this Court that Applicant and its officers tried valiantly to seek out alternatives to demolition. Were preservation of the Smith House in any way feasible, Applicant provided the best opportunity for rehabilitation to occur. Applicant is a respected, established, and deeply resourced construction company that has had many years of experience in successfully rehabilitating historic structures.

The cold hard truth became apparent as our hearings were completed: the Smith House was lost decades ago to severe neglect, loss of its roof's integrity, collapse of some of its ceilings and walls, and the extensive intrusion of rain water, ground water, and mold. The trial revealed that some of the efforts to save the Owl's Club operations within the Smith House likely led to its further degradation, since some improvements involved compromises to and removal of several structural roof timbers, footings, and walls in the basement.

The City Fire Marshall has been concerned about the safety of the Smith House for several years and saw fit to put his concerns in a formal notice to the prior owners in 2010,

which was two years before Applicant gained ownership and control of the Subject Property. There was no evidence presented at trial that the then owners or any other community members saw fit to take any steps to protect or rehabilitate the Smith House. In fact, trial testimony revealed that several efforts to acquire and rehabilitate the Smith House failed or were otherwise rebuffed by the prior owner. Only when the Smith House passed beyond the point of any possible rehabilitation was Applicant then able to secure ownership. But by then, their efforts were too late, not because of their delay, but because of the prior owner's inability or unwillingness to allow for the Smith House to be saved. Whether wise or possible, no neighbor, City organization, or other organization saw fit or was able to intervene to save the Smith House while it passed beyond a stage of potential rehabilitation.

At the time of trial, the Smith House was beyond repair or habitability. Appellants' desires to save an historic and once notable structure in their neighborhood are clearly sincere and even admirable, but they were unable to present any credible evidence that rehabilitation is in any way feasible. Their expert's rehabilitation plans were incomplete, provided no plans for heating/ventilation/HVAC systems, and no access to the rehabilitated upper floors that would be ADA-compliant. Most important, no expert could assure that any rehabilitation plan would rid the Smith House of the mold that has infiltrated all components of the House, such that mold removal can only be assured by the total removal of the structure.

When a determination is made, such as here, that no acceptable alternatives exist to demolish an historic structure, the Regulations require that "the following must be met:"

1. The significance of the structure, gardens, landscaping and outbuildings, if any, shall be assessed and recorded. A photographic record that includes scale shall be made as part of the site inventory work. Significant architectural features or items of historical importance shall be identified.

2. Public interest for structural preservation shall be sought and considered. Salvage options, whether through the City or other appropriate groups with interest in local history, shall be proposed as part of the demolition proposal.

3. Circumstances and condition of the structure shall be evaluated. A qualified engineer's opinion on the structural integrity of the building shall be obtained, together with an estimate of needed stabilization and necessary code compliance work to be performed.

4. The physical and economic feasibility is part of the decision to approve a demolition. Using comparable rehabilitated structure values, and income if

applicable, rehabilitation cost vs. new redevelopment cost shall be provided for consideration. Efforts shall be made to develop and offer alternative plans, including financing help through low-cost loans and other incentives to attract interested users and project developers.

5. The City has 90 days to find acceptable alternatives to the demolition, if it feels that it is physically and economically feasible.

6. See also Section 706 of this Ordinance as it refers to demolition.

Regulations § 706(A)(8)(e). We address each of these directives in turn.

As to the first criteria, Applicant's historian, Susan C. Jamele, completed a thorough evaluation of the history, characteristics, and significance of the Smith House and its Additions, as is evidenced by her initial and supplemental reports. See Exhibits 21 and 22. Her reports include an extensive photographic and plan record of the structures; her reports also identify significant architectural features and other items of historical importance. We conclude that Exhibits 21 and 22 satisfy Regulations § 706(A)(8)(e)(1).

As to the second criteria, Applicant, through its officials, made numerous overtures to public officials, neighbors, and historical interest groups, seeking ideas on how the Smith House could be preserved. One of the sad consequences of the current condition of the Smith House is that no one responded to Applicant's solicitations, save for the suggestions made by Appellants at trial, which the Court has reviewed here but has determined to be inadequate. We conclude that Applicant's presentation satisfied Regulations § 706(A)(8)(e)(2).

Applicant satisfied Regulations § 706(A)(8)(e)(3) by retaining Ruggiano Engineering to complete an evaluation of the circumstances and condition of the Smith House structures. Mr. Ruggiano is a qualified, Vermont-licensed engineer who provided a thorough opinion on the structural integrity of the building and estimates of work needed for stabilization and necessary code compliance, were the Smith House rehabilitation to be attempted. His evaluation and report were admitted at trial as Exhibit 6. Mr. Ruggiano provided further explanation and expansion on his report during his trial testimony, which the Court found credible. Those estimates revealed the inordinate expenses for the Smith House rehabilitation, as noted below.

As to the fourth criteria, the Smith House is neither physically nor economically feasible to rehabilitate. Although the parties agree that the Smith House Additions cannot and should not be saved, demolition of just the Additions is most likely impossible without causing

significant damage to the original Smith House as a consequence of the removal and compromise of significant structural timbers when the East House Addition was constructed. Appellants asserted that structural supports could be used to save the Smith House during demolition of the Additions, but they provided no credible details of how this work could be accomplished. Rather, that demolition will likely result in further damage to the Smith House.

Furthermore, the current condition of the Smith House lends credence to Applicant's assertion that its rehabilitation is not economically feasible. Over thirty years have passed since the Smith House was actively used or maintained. Trial testimony revealed that several rehabilitation plans were investigated, but that the proponents of those plans did not pursue rehabilitation after investigating further what work would be necessary.

Applicant completed a thorough and exhaustive investigation of what would be necessary to rehabilitate the Smith House. The Court became convinced by the completion of the trial that Applicant initially hoped to rehabilitate this historic structure, and was only dissuaded by the needed rehabilitation efforts. Some grant and alternative loan options were suggested and investigated, but none were revealed that would materially reduce the enormous expense, which Applicant's witnesses credibly estimated would exceed $2,316,000.00. Such an expense would exceed the market rates for commercial construction and leasing by at least five hundred percent, thereby making the rehabilitation efforts economically infeasible.

Conversely, demolition and construction of a new building remains physically and economically feasible. The demolition and reconstruction alternative will produce a viable commercial office building that is mold-free and code and ADA compliant. These results cannot be feasibly accomplished through rehabilitation of the Smith House. For all these reasons, we conclude that Applicant's proposed demolition and re-construction alternative conforms with Regulations § 706(A)(8)(e)(4).

As to the fifth criteria, the City and all parties with an interest in proposing or assuming rehabilitation of the Smith House had sixteen months from when Applicant first submitted its demolition and re-construction proposal to when this appeal went to trial. No party came forward with an alternative rehabilitation plan that would be physically or economically

feasible. For these reasons, we conclude that Applicant's proposed demolition and re-construction alternative conforms to Regulations § 706(A)(8)(e)(5).

Finally, Applicant's propped demolition conforms to all provisions within Regulations § 706 that refer to demolition.

Based on the evidence presented at trial, and as described above, we became convinced that Applicant, through its officers, actively sought out alternatives to demolition. Unfortunately, the Smith House was lost decades ago to severe neglect, loss of its roof's integrity, collapse of some of its ceilings and walls, and the extensive intrusion of rain water, ground water, and mold. The alterations to the Smith House and additions as the Owl's Club attempted to continue its operations predate Applicant's purchase of the Property and led to further degradation of the structure integrity of the Smith House. The City Fire Marshall put his concerns about the safety of the Smith House in a formal notice to the prior owners in 2010, two years before Applicant gained ownership and control of the Subject Property.

Appellants' desire to save the Smith House is admirable; they did not, however, present credible evidence that rehabilitation of the Smith House is physically or economically feasible. Furthermore, the current condition of the Smith House lends credence to Applicant's assertion that its rehabilitation is not economically feasible: many years have passed since the Smith House was actively used. Trial testimony revealed that several rehabilitation plans were investigated, but that the proponents of those plans did not pursue rehabilitation after investigating what work would be necessary.

For these reasons, we conclude that Applicant's proposed demolition of the Smith House satisfies Regulations § 706(A)(8)(e).

**B. Compatibility of Proposed Re-Development with Other Neighborhood Uses.**

Appellants challenge the proposed re-development's compatibility with other neighborhood uses. Permitted uses allowed in the B-1 District include office and clerical uses, while conditional uses in the B-1 District include clinical or medical facilities. Regulations § 304. Applicant seeks a permitted use permit for its proposed office use and a conditional use permit for its proposed clinical/medical facility. Approval is mandated by the Regulations if a proposal to use property for a permitted use conforms to the dimensional requirements for the zoning

district within which it is located. Regulations §§ 601, 905.1(A). Applicant's proposal to use some or all of the proposed building as a clinic or medical facility, however, requires a showing that the entire development conforms to the conditional use provisions of the Regulations. See Regulations § 602.

Regulations § 602.2(B) directs "that the proposed use shall not have an undue adverse effect on . . . [t]he character of the area affected, as defined by the purposes of the zoning district within which the project is located . . . ."[6] Appellants' first challenge to the proposed redevelopment of the Subject Property is that it is not compatible with other neighborhood uses. We therefore look to the purpose provisions for the applicable zoning district, the B-1 District, which are detailed in Regulations § 303(C)(1):

> It is the intent of the B1 - Central Business Subdistrict to provide for a diverse range of business and service uses within the traditional business center of the City. The subdistrict is intended to protect and enhance the function of the downtown area as the primary commercial, financial, retail and governmental center of the region. It is designed to accommodate a wide variety of commercial activities, particularly those which benefit from pedestrian activity and access. Design criteria for the subdistrict are intended to protect the National Landmark Historic District and the special urban features of Taylor Park.

Although Appellants present a picture of their neighborhood that is purely residential and suggest the neighborhood will suffer from the project's proposed office uses, the credible facts presented at trial do not support these assertions. Uses similar to what Applicant proposes already exist in this neighborhood and such uses complement the stated purpose of the zoning district. Applicant's proposed development complements and does not contradict the purpose provisions for the B-1 District. The proposed uses will add to the diversity of commercial uses existing in this neighborhood and will not conflict with the uses of the adjacent properties, such as the large apartment building across Maiden Lane and the dentist's office across Congress Street. The proposed uses do not wholly conflict with the use of the adjacent property occupied by Mr. and Mrs. Prent, Appellants in these proceedings, as they also use their property for certain commercial endeavors. Applicant's proposed uses also

---

[6] Regulations § 602.2(B) continues with a reference to the "specifically stated policies and standards of the municipal plan." But we received no testimony or other evidence concerning those municipal plan provisions and therefore do not embark on an analysis of them.

complement the uses of properties approximately one block to the north, such as the J. C. Penny's and Ace Hardware retail stores. Furthermore, the proposed uses "accommodate a wide variety of commercial activities, particularly those which benefit from pedestrian activity and access." Id.

For these reasons, we conclude that Applicant's proposed re-development is compatible with the stated purposes for this zoning district and will not have an undue adverse effect on the character of the area. We therefore conclude that the proposed re-development conforms to Regulations § 602.2(B).

## C. Harmony With Existing Development.

Appellants challenge the compatibility of the proposed development with existing adjacent uses. Under the Regulations, any development proposal that involves new construction or changes to off-street parking must also satisfy the general criteria and standards for major site plan review. Regulations §§ 603.1(B)(1)(c) and § 603.4. Regulations § 603.4(A) includes as a standard for review the "[h]armonious relationship between the proposed uses and the existing adjacent uses."

As detailed in our Findings of Fact above, the Subject Property and surrounding properties are located within the National Landmark Historic District, the Design Review 1 – Traditional Downtown Overlay District, and the B-1 Sub-District of the Business Zoning District. Uses of adjoining properties include the St. Albans Free Library, Episcopal and Baptist Churches, a dental office, single family residences, and a large apartment building  The Subject Property and its surrounding neighborhood are located less than one City block from Taylor Park, which is located along Main and Church Streets, at the center of the downtown Business District, where a variety of business and commercial uses already exist. These uses are intertwined with residential uses, particularly as one moves farther away from Main Street, a/k/a U.S. Route 7, and the rear of businesses along Main Street can be viewed from the Subject Property.

Applicant's proposed development complements and is in harmony with the mixed use development of this neighborhood that is part of the City's downtown business district. In an effort to make their proposed development more harmonious, Applicant revised its building design and added moldings, re-designed the exterior surfaces, and integrated window

-22-

placement that complements the characteristics of the nearby buildings. Applicant revised its rear parking plan to add more green space. Their revised on-street parking plan helps widen the traveled lane and increases the available parking, both for its business visitors and visitors to the adjacent Library.

For these reasons, we conclude that Applicant's proposed development is in harmony with the adjacent neighborhood uses and therefore complies with Regulations § 603.4(A).

### D. Impact on Traffic.

Appellants also challenge Applicant's proposed project because they believe that it will generate increased traffic that will adversely impact the neighborhood. In order to receive conditional use approval, Applicant must show that the proposed project will not "have an undue adverse effect on . . . traffic on roads and highways in the vicinity . . . ." Regulations § 602.2(C).

Applicant presented credible expert testimony concerning the anticipated traffic for the re-developed site. Applicant's expert then substantiated his estimates with references to the Trip Generation Manual published by the Institute of Transportation Engineers. Applicant's engineer credibly estimated that traffic from the fully developed and occupied site will not likely increase beyond the traffic generated from nearby existing uses and will not exceed the traffic generated by the prior Owl's Club use. In contrast, Appellants provided no traffic experts or testimony to substantiate their concerns. Thus, we conclude that the proposed project will not have an adverse impact (undue or otherwise) upon the neighborhood or its roadways.

A similar analysis is required under the applicable major site plan review standards, which require consideration of traffic access, circulation, parking, and pedestrian and bicycle safety and access. Regulations §§ 603.4(B) and (C). One-way travel on Maiden Lane has now been designated to flow in a south to north direction, thereby providing for greater visibility of the intersection of Maiden Lane and Congress Street, and for greater visibility for pedestrians and bicyclists entering into that intersection. Additionally, Applicant's development will replace an undefined gravel parking area on the rear portion of the Subject Property with a properly-defined parking area with a specific access point from Congress Street.

These improvements along Maiden Lane will increase the travelled portion of the street, making it safer; reconstruct the sidewalk along the Property; and double the number of parking spaces available on Maiden Lane. Appellants complain about the change to the on-street parking from parallel to angled, but this parking scheme replicates the parking available throughout Main Street and will allow for increased parking for the visitors to the adjacent Library. There was no testimony on an inherent problem with angled parking along City streets; in fact, the angled parking will complement the one-way traffic along Maiden Lane, particularly in the direction that traffic will now flow.

For these reasons, we conclude that Applicant's proposed development will not have an adverse impact upon the traffic, parking, or circulation for either vehicles or pedestrians and bicycles in this neighborhood. In fact, we conclude that once the site work is completed according to the proposed plans, the proposed project will improve traffic flow and the safety of the pedestrians and bicyclists in this neighborhood.

### E. Angled Parking on Maiden Lane.

As just noted, Appellants expressed concerns, even dismay, about Applicant's proposal to realign the parking along Maiden Lane. One concern they expressed was that the proposed angled parking will require vehicles to back out in to the travelled portion of Maiden Lane. Appellants did not convince the Court, however, that this revised parking plan was any more adverse than the existing system of parallel parking, which also requires vehicles to back up while in the travelled portion of Maiden Lane when attempting to pull in to a parallel parking spot. In fact, Applicant's expert convincingly testified that vehicles can more effortlessly enter and exit angled parking spaces than parallel parking spaces. Interestingly, angled parking is used throughout the neighboring downtown area. We received no testimony of adversity caused by that parking arrangement.

For all these reasons, we conclude that the angled parking that Applicant proposes in front of the proposed development conforms to the applicable conditional use and site plan provisions that Appellants preserved for our review in this appeal.

Having reached determinations in favor of Applicant on all of the revised Questions that Appellants presented at the close of trial, we conclude that Applicant's requests for authority to

demolish the existing structures and redevelop the project conform to the applicable regulatory provisions and must therefore be approved.

## Conclusions

For all the reasons expressed above, we conclude that Applicant's proposal to demolish all the structures at 13 Maiden Lane, including the historic Smith House, construct a new office building (with accompanying site improvements) and use that new structure for office, clinical, and medical office uses conforms to all applicable provisions of the Land Use Regulations for the City of Saint Albans, including the conditional use and site plan provisions that Appellants preserved for our review in this appeal.  The May 28, 2013 decision from the City of Saint Albans Development Review Board approving Connor Group, LLC's application is hereby **AFFIRMED**, subject to the condition that Applicant cause its engineers to submit certified and final plans for its revised project to the appropriate City planning officials.

This completes the current proceedings before this Court.  A Judgment Order accompanies this Decision.

Electronically signed on April 24, 2015 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division